# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | : |
| | : |
| **Plaintiff,** | : |
| | : **Case No: 2:24-cr-180** |
| | : **(and Case No. 2:13-cr-270)** |
| **vs.** | : |
| | : **JUDGE SARGUS** |
| **JOEL BROWN,** | : |
| | : |
| **Defendant.** | : |

## GOVERNMENT'S SENTENCING MEMORANDUM

Now comes the United States of America, by and through undersigned counsel, and hereby submits its Memorandum in aid of sentencing.

## I.   BACKGROUND

On December 10, 2024, a federal grand jury returned an Indictment charging Defendant **JOEL BROWN,** in Counts One through Eleven with Possessing and Training a Dog for Use in an Animal Fighting Venture, in violation of 7 U.S.C. § 2156(b), in Count Twelve with Possession with Intent to Distribute 50 Grams or More of Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii), and in Count Thirteen with Felon in Possession of Firearm, in violation of  18 U.S.C. §§ 922(g)(1) and 924(a). On August 7, 2025, Defendant entered a plea of guilty to Counts One and Twelve of the Indictment pursuant to a Rule 11(c)(1)(A) plea agreement. The plea agreement contained an attachment, which detailed the factual statement of Defendant's offense conduct in support of his guilty plea. The plea agreement also contained the parties' agreement to a base offense level of 24 (as to Count Twelve), a two-level increase for possession of a firearm, no increase for maintaining a premises for manufacturing or distributing a controlled substance, and a three-level reduction for

1

acceptance of responsibility. Defendant also agreed to pay restitution to Columbus Humane in the amount of $8,054.48.

The Probation Officer released the final Presentence Investigation Report ("PSR") and sentencing in this matter is scheduled for December 11, 2025.

## II.      PRESENTENCE INVESTIGATION REPORT

The United States has reviewed the PSR in this case and submits that the Probation Officer has correctly calculated the advisory sentencing guidelines range. The United States thus raises no objections to the PSR. The advisory guidelines range reflected in the PSR is 57 to 71 months of incarceration. However, because the statutory mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(B) is 60 months for Count Twelve, the range becomes 60 to 71 months. In addition, the statutory minimum term of supervised release is four years. *Id.*

## III.     SENTENCING FRAMEWORK

After *Booker v. United States*, 543 U.S. 220 (2005), district courts are to engage in a two-step sentencing procedure.[1] Courts are first to determine the applicable guidelines range, then consider the applicable guidelines range—along with all of the factors listed in 18 U.S.C. § 3553(a)—to determine what sentence to impose. *Gall v. United States*, 552 U.S. 38, 49–50 (2007); *Rita v. United States*, 551 U.S. 338, 351 (2007). The central command to district courts in imposing a sentence is to fashion one that is sufficient, but not greater than necessary, to meet the goals set forth in 18 U.S.C. § 3553(a).

Section 3553(a) further delineates seven factors the Court must consider in fashioning an appropriate sentence: (1) the nature and circumstances of the offense/history and characteristics of the defendant; (2) the statutory purposes of sentencing; (3) the kinds of sentences available;

---

[1] Effective November 1, 2025, the Guidelines have been amended to excise departures from the sentencing analysis; many of the factors in Chapter 5 remain relevant under the § 3553(a) factors, rather than as departures.

(4) the kinds of sentences and sentencing ranges as set forth in the Sentencing Guidelines; (5) Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

## IV.  ANALYSIS AND RECOMMENDATION OF THE UNITED STATES

As noted above, there are seven factors the Court is to consider during sentencing, pursuant to 18 U.S.C. § 3553(a). The Government submits that while the Court should consider each of the above factors, the nature and circumstances of the offenses, the history and characteristics of the defendant, the seriousness of the offenses, the need to afford adequate deterrence to criminal conduct, and the need to avoid unwarranted sentencing disparities warrants a sentence at the top of the guidelines range in the instant case to run consecutive to the recommended sentence in case number 2:13-cr-270.

### A.  Nature and Circumstances of the Offenses

The nature and circumstances of the offenses are described in detail in both the PSR at ¶¶ 13 to 21 and Attachment A of the plea agreement. In summary, in April 2024, Columbus Humane agents visited 670 Rhoads Avenue, Columbus, Ohio to address a complaint of dogs being left outside. When no one answered the door, the agents left a notice with their contact information and departed the residence. A short time later, Defendant approached the humane agents to claim ownership of the dogs and invited the agents back to the property to observe that the dogs had shelter. Upon entering the fenced-in portion of the property, humane agents observed visible scarring on several pit bull-type dogs[2] and further observed that they were

---

[2] "Pit bull" is an umbrella term used to describe several breeds of dogs, including the American Pit Bull Terrier, the Staffordshire Bull Terrier, the American Staffordshire Terrier, and the American Bully, among others. https://bestfriends.org/pet-care-resources/pit-bulls-everything-you-need-know.

secured in the yard in a manner consistent with organized dogfighting—they were tethered with heavy tow chains attached to tire axels buried in the ground. After leaving the Rhoads property, agents reviewed Defendant's social media platforms and found additional evidence consistent with his participation in organized dogfighting, including a video of a black pit bull (later identified as BY7) with visible scarring running on a slat mill, information for purchasing pit bull puppies from a convicted dogfighter, discussions of training for and participating in upcoming dogfights, and posting about dogs' fighting pedigrees.

Equipped with the above intelligence, Columbus Humane, assisted by the Columbus Division of Police and ATF (collectively "law enforcement"), executed a search warrant at 670 Rhoads on May 15, 2024. Once on scene, law enforcement located 12 dogs; two canines (G1 and D1) were located in the residence, one closed in a bedroom covered in feces and one roaming the living room. Nine additional canines (BY1 through BY9) were secured in the backyard on heavy tow chains (used to build strength and stamina), and just out of reach but still visible to each other (promoting chronic agitation but preventing them from harming one another outside the presence of the handler).[3] A twelfth canine (J1), a puppy, was found in a cage with the top falling in on his head in a garage on the property. All eleven adult dogs were pit bull mixes, and each had varying degrees of scarring on their face, legs, and chest, consistent with dogfighting injuries.[4] Many of the dogs also had additional medical ailments consistent with a failure to properly care for the canines, including being underweight, having fleas, skin infections, and ear infections.

---

[3] Government's Exhibit 1 includes a series of photographs of several of the dogs located in the backyard of the property before they were seized.

[4] Government's Exhibits 2A to 2C includes a series of photographs of each of the adult dogs and *some* of their obvious visible injuries upon intake at Columbus Humane. (These were broken down into three sets of exhibits for filing capacity purposes only).

Inside the residence, law enforcement located varying types of treadmills, including a slat mill, a carpet mill, and an electric treadmill (used to promote endurance), a flirt pole (used to promote agility, strength, and aggression), break sticks (used to open a dog's jaws after it had locked onto another dog), a hanging scale, makeshift veterinary supplies (used to treat fight wounds and help dogs make weight without subjecting them to scrutiny at an established veterinary clinic), and pieces of plywood that appeared to be splattered with blood (used for makeshift fighting pits). Law enforcement also located a loaded Mossberg Model 590M 12-gauge shotgun and 50-round drum magazine, a crate of 156 rounds of miscellaneous ammunition, a digital scale, and three separate baggies that totaled 53.48 grams of a mixture or substance containing methamphetamine and approximately 2 grams of fentanyl. These items were located nearby the dogfighting paraphernalia located within the house and described above. Because of their visible fighting injuries and temperament, all eleven adult canines were ultimately humanely euthanized pursuant to Columbus Humane policy. The seized puppy (J1) was able to be adopted out to a new family.

**B.      History and Characteristics of the Defendant**

Defendant is 38 years old and has lived his entire life in Columbus. His parents divorced when he was a toddler, and he and his two siblings were primarily raised by his mother. Defendant recalls residing in poor neighborhoods where his family sometimes struggled to find housing and food and where he was exposed to violence and drug activity. Defendant's mother started a long-term relationship with Mickey Tate, who he considers stepfather, when Defendant was eight, which resulted in five maternal half-siblings. While Defendant reported that Mr. Tate was physically abusive towards him when he was young, he has since reconnected with his stepfather, who currently suffers from pancreatic cancer. Defendant recalls that he started

supporting himself at age 17 when he moved out of an uncle's house, who did provide him some stability has a teenager. Both of Defendant's parents passed away by 2010.

Defendant has one young child with his girlfriend of four years and two children from prior relationships. He was shot in 2007 but has no ongoing problems from the injury. It is noted in the PSR, that in 2014, Defendant was described as having major functional deficits emotionally and intellectually. He was most recently diagnosed with mood disorder, ADHD, learning difficulty, and cannabis use disorder in 2022. However, following a mental health assessment in 2023, he was not recommended for further treatment. He withdrew from high school in the 9th grade where he participated in specific learning disability curriculum. Defendant has limited prior employment history but most recently worked as a construction laborer prior to his arrest in the instant case.

Just over ten years ago, Defendant was sentenced to 108 months on his first federal case for serious drug and gun charges stemming from a multi-defendant prosecution involving the notorious Columbus street gang, the Short North Posse. In that case, Defendant stored, sold, and transported cocaine, obtained firearms to protect drug proceeds, and agreed to assault, torture, and pistol whip another individual who owed the organization seized drugs before being thwarted by law enforcement. While this was Defendant's first serious criminal activity, it was not his first encounter with the justice system. Prior to the 2013 case, he picked up state felony convictions for obstruction, theft, and drug possession. Notably, Defendant also has prior misdemeanor convictions stemming from handing another individual a loaded gun and directing that person to kill someone, and for failing to confine several pit bull type dogs. Defendant began supervised release for his prior federal case in September 2021. While the Government appreciates that Defendant "made himself available for contacts at his home and his place of

employment," (Doc. #790-1, case no. 2:13-cr-270), he initially failed to comply with treatment, failed to provide verification of his educational efforts toward his GED, and ultimately picked up the underlying serious offenses. By Defendant's own admission (PSR, ¶ 28), he was on supervised release for less than two years before he began committing new federal crimes.

        C.      **<u>Seriousness of the Offenses, Respect for the Law, and Just Punishment</u>**

While this Court often sees before it cases involving drug and gun crimes similar to that described herein, dogfighting cases are (luckily) rarer. Organized dogfighting bears no resemblance to the quarreling that pet dogs might do in a backyard over a toy. It is an extreme form of cruelty to animals, not only inside the fighting ring itself, but also in the specific practices leading up to a fight and, if either dog survives, after a fight. A survey of the grotesque rituals of the dog fighting "industry" can be found in an annotated memorandum authored by Judge Reagan of the Southern District of Illinois as part of the sentencing proceedings in *United States v. Berry, et al.*, 3:09-cr-30101, 2010 WL 1882057 (S.D. Ill., May 11, 2010).[5] This survey summarizes the nature of the crime, the burden it places on communities, and its links to other types of criminal activity. As Judge Reagan's memorandum illustrates, dogfighters take cruel advantage of pit bull-type dogs' eagerness to please humans, all for gambling purposes, financial gain, or a disturbing form of "entertainment." From a similar perspective, the District of New Jersey referenced the serious nature of the crime of dogfighting in varying upward in its ultimate sentence, explaining:

> this offense embodies such cruelty, just the enterprise of training dogs to fight, of staging dogs to fight, of keeping dogs in boxes in the basement, of medicating them by people who are not trained in medicine, clearly not professionals, all of the materials that were seized showed how these dogs were treated by these amateurs with all kinds of medications that were for cattle and for other kinds of animals, the very concept of this enterprise of

---

[5] Attached as Government's Exhibit 3.

staging dogs to fight each other and kill each other is so despicable and so uncivilized that I think the nature of the offense warrants a variance.

*United States v. Gaines*, 3:17-cr-309, Tr. of Sentencing H'g at 17 (D.N.J. Mar. 5, 2018).

The facts of this case show why such strong sentiments are warranted. In addition to a loaded shotgun, 156 rounds of ammunition, and over 50 grams of methamphetamine—harmful to the community in ways all their own as Defendant's prior federal case aptly demonstrated—Defendant was in possession of eleven fighting dogs.

The harm that was to be visited upon these dogs and their opponents is difficult to quantify, but it is nonetheless inescapable. Given the extensive, secretive networks that are needed to solicit opponents and to locate, buy, and sell dogs of particular coveted bloodlines, dogfighting is organized crime in the traditional sense of that term. But the costs of dogfighting are borne not only by the direct victims, the dogs, but also by the communities in which this activity is engaged. Undesirable dogs are often killed by their owners, or else abandoned at shelters, putting a strain on nonprofits, like Columbus Humane. As noted in the PSR, taking in large numbers of abused fighting dogs affects local shelters' ability to help other animals in need. Moreover, criminal activity like that of Defendant continues to perpetuate the myth that pit bull-type dogs are dangerous all on their own, making even those that are not involved in dogfighting harder to adopt out, and often the first on the list to be euthanized in overcrowded shelters that run out of space. Furthermore, dogs housed for fighting that escape their confinement pose a particular hazard to other dogs, as well as humans—a fact Defendant was previously put on notice of in 2010.

**D**.     **Need to Afford Adequate Deterrence to Criminal Conduct**

General deterrence will only be served if the Defendant receives a significant punishment. This is Defendant's second federal case involving drug trafficking and firearms in

just over a decade. Additionally, dogfighting is a highly secretive enterprise that is difficult for law enforcement and investigative professionals to infiltrate. A dogfighting investigation requires many of the same skills and resources employed in major undercover narcotics investigations, thus challenging the resources of any agency that seeks to respond to it. Given the limited law enforcement resources available for cases such as this, and the strain it places upon animal shelters called upon to care for the large numbers of dogs seized in these investigations, it is imperative that the sentences imposed in the few cases that are able to be brought send a strong message of deterrence. Those who choose to brutalize animals for entertainment and profit must know that their criminal conduct will be severely punished. *See Gaines*, *supra*, Tr. of Sentencing Hr'g at 18 ("[A]nimal cruelty is a horrible offense, uncivilized, and warrants punishment and deterrence. It's important for society to know that this is a serious offense, that it's a grievous offense, that the animals deserve something better than this."). Consequently, a strong sentence is needed to "afford adequate deterrence to criminal conduct" to other potential offenders. 18 U.S.C. § 3553(a)(2)(B).

The combination of drug trafficking, possessing a loaded firearm, and harboring eleven dogs for fighting purposes deserves a sentence at the top of the guidelines. Additionally, the sentence imposed in the instant case should run consecutive to Probation's recommended sentence in case number 2:13-cr-270. Defendant should not be rewarded for his recidivism, let alone the obvious escalation of his criminal behavior. While it is unclear whether any length of sentence will deter this defendant, a sentence of 104 months may have a general deterrent effect on others and will, at the very least, protect the public from further crimes of Defendant during his term of incarceration.

Congress first enacted the federal animal fighting prohibition in 1976. *See* Pub. L. No. 94-279, § 17, Apr. 22, 1976, 90 Stat. 421. It was prosecuted for the first time twenty-two years later, and not again until the prosecution of Michael Vick in 2007. The Vick case exposed the public for the first time to the true "horrors of dog fighting," Att. 1 at 21, including the acute animal suffering that occurs before, during, and after dog fights. In particular, the defendants in that case admitted as part of their guilty pleas to having drowned, hung, and bludgeoned underperforming fighting dogs to death. The following year, Congress increased the penalty to a five-year felony and significantly broadened the scope of the offense. *See* Pub. L. No. 110-234, Title XIV, § 14207(a), May 22, 2008.

Since that time, federal and state authorities have increased prosecutions in this area. But even so, only a few dozen defendants have been prosecuted in federal dog fighting cases since the first federal prosecution in 1998. From this relatively small body of cases, a clear pattern has emerged from the sentencing case law: a notable trend toward top-end and above-guidelines sentences, based largely on the cruelty of the offense. The U.S. Sentencing Commission also increased the base offense level of the pertinent guideline, U.S.S.G. § 2E3.1, from 10 to 16, in November, 2016. The Commission stated that the increased base offense level "better accounts for the cruelty and violence that is characteristic of these crimes." Sentencing Guidelines for United States Courts, 81 Fed. Reg. 27,262, 27,265 (May 5, 2016).

When it increased the base offense level in 2016, the Commission found that "offenders who received the base offense level of 10 under § 2E3.1" had been sentenced to above-guidelines sentences at a rate more than fifteen times higher than the average across all offenses. *Id.* Further, "[f]or those animal fighting offenders sentenced above the range, the average extent

of the upward departure was more than twice the length of imprisonment at the high end of the guideline range." *Id*.; *see also id.* (finding "a high percentage of above range sentences in these cases").

Even after the Sentencing Commission increased the base offense level in 2016, defendants in some dogfighting cases have still received sentences well above the guidelines range, which were sustained on appeal. *See*, *e.g.*, *Richardson*, *supra*, 2017 WL 6055773, *2-3 (varying upward from 12 to 18 month guidelines range to 96 months), *aff'd*, 796 Fed. App'x at 803; *Chadwick*, *supra*, 2017 WL 6055384, *2-3 (same case, upward variance from 12 to 28 month guidelines range to 60-month sentence; affirmed in same appeal); *United States v. Cook*, 7:16-cr-122, 2017 WL 6055385, *2 (E.D.N.C. Dec. 1, 2017) (varying upward from 15 to 21 month guidelines range to 45 month sentence; affirmed in same appeal); *United States v. Thompson*, 7:16-cr-122 (E.D.N.C. Dec. 22, 2017) (varying upward from 24 to 30 month guidelines range to 48 month sentence; affirmed in same appeal); *United States v. Casillas-Montero,* 152 F.4th 306 (1st Cir. 2025) (affirming sentence with upward variance from a 12 to 18 month guidelines range to 84 months). Although not all federal defendants in dogfighting cases have received above-guidelines sentences, there has been a clear trend among judges in these cases to impose significant sentences.

Here, the United States is not asking for an above-guidelines sentence (although one could arguably be warranted). The Government is, however, asking for a top of the guidelines sentence that runs consecutive to Defendant's underlying supervised release violation. The guidelines range for the instant offense conduct would be the same even if Defendant committed only the drug and gun offenses—that is, the current guidelines range does not even technically account for the dogfighting crimes, which in the United States' view, is the most heinous aspect

11

of Defendant's newest criminal conduct. Albeit all three types of crimes committed are undisputedly dangerous to society in their own way. Additionally, the Government exercised its discretion in charging the instant case with the understanding that Defendant would ultimately be facing additional prison time for his supervised release violation. As noted above, this is Defendant's second federal drug trafficking case that also involved a firearm—it is not charged that way. Accordingly, a sentence of 104 months is necessary to avoid unwarranted sentencing disparities between repeat drug and gun offenders who also engage in the violent and cruel enterprise of dogfighting.

## V.     **<u>CONCLUSION</u>**

For all of the foregoing reasons, the United States respectfully submits that a term of imprisonment of 71 months in case number 2:24-cr-180 to run consecutive to 33 months in case number 2:13-cr-270 for a total term of imprisonment of 104 months, followed by a term of supervised release of at least four years in case number 2:24-cr-180, would be sufficient but not greater than necessary to achieve the statutory goals of sentencing. The Government would also request that the Court impose a special condition of "no possession of animals" during the period of supervised release imposed. Finally, the United States requests the Court order the agreed-upon restitution of $8,054.48 to Columbus Humane.

Respectfully submitted,

DOMINICK S. GERACE II
United States Attorney

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
Environment and Natural Resources Div.
U.S. Department of Justice

*s/ Nicole Pakiz*
NICOLE PAKIZ (0096242)
KEVIN W. KELLEY (0042406)
Assistant United States Attorneys
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
(614) 469-5715
Fax: (614) 469-5653
Nicole.Pakiz@usdoj.gov
Kevin.Kelley@usdoj.gov


*/s Adam C. Cullman*
Adam C. Cullman (KY #93912)
Special Assistant United States Attorney &
Senior Trial Attorney
Environmental Crimes Section
Environment and Natural Resources Div.
221 E. 4th St. Ste. 400
Cincinnati, Ohio 45244

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of December 2025, a copy of the foregoing

Government's Sentencing Memorandum was filed electronically. Notice of this filing will be

sent to all parties by operation of the Court's electronic filing system.


*s/ Nicole Pakiz*
NICOLE PAKIZ (0096242)
Assistant United States Attorney